Kim and Katrina
HARRISON, Appellants,

v.

Richard and Dinah Jo
ROBERTS, Respondents.

No. WD 42524.

Missouri Court of Appeals,
Western District.

Oct. 23, 1990.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 4, 1990.

Application to Transfer Denied
Jan. 9, 1991.

James P. Frickleton, Kansas City, for
appellants.

Sylvester Powell, Jr., Kansas City, for
respondents.

Before KENNEDY, P.J., and
SHANGLER and GAITAN, JJ.

GAITAN, Judge.

This case involves a suit for personal
injuries and loss of consortium as a conse-
quence of injuries which occurred on leased
premises occupied by appellants. The
plaintiffs-appellants, Kim and Katrina Har-
rison, appeal the judgment of the trial
court which set aside the jury verdict

against defendants-respondents, Richard and Dinah Jo Roberts. The appellants allege the trial court erred by granting a judgment notwithstanding the verdict and by denying appellants the opportunity to present evidence which they believe supported their theory that respondent maintained control over the leased premises. We reverse.

In May of 1983, the plaintiffs, Kim Harrison and his wife Katrina Harrison, entered into a written rental agreement with the defendants, Richard Roberts and his wife Dinah Jo Roberts. The subject of the lease was a two bedroom house owned by the defendants. The rental agreement provided that the nature of the lease would be month-to-month and stated that the rent would be two-hundred and twenty-five dollars per month. The rental agreement further obligated the Harrisons to "maintain and return the premises in as good condition as when rented" and predicated the return of the security deposit on the appellants repairing any damages, beyond normal wear and tear, before vacating the premises. Aside from this language, the rental agreement was silent concerning who bore the responsibility of making repairs on the property.

On the evening of July 16, 1984, Mr. Harrison was changing a light bulb over the porch and steps that led into the backyard. After installing the bulb, Mr. Harrison stepped back and fell over the side to the ground below. Although there was a guardrail surrounding the porch, it collapsed and permitted Mr. Harrison to fall. As a result of the fall, Mr. Harrison sustained a severely broken leg.

The Harrisons filed the present action against the Robertses in an effort to recover for the injuries sustained by Mr. Harrison and for a loss of consortium sustained by Mrs. Harrison. The theory of negligence submitted to the jury was that the Robertses, as landlords, had retained control of the premises and they were liable for failing to keep the stairs, porch, and guardrail in a reasonably safe condition. Appellants contend that actions by the Robertses, such as retention of keys, inspection of the premises, promises to make repairs and actually making repairs on the premises, indicate a retention of control by the respondents.

At trial, the appellants sought, and were denied, introduction of evidence relating to insurance coverage held by the Robertses on the leased premises, the lack of a building permit for the stairs in question, and violations of the Kansas City Building Code. It was the appellants' contention that the evidence was relevant and admissible to show control of the premises by the Robertses and knowledge of the dangerous condition.

The jury found that "defendants retained partial control of the house for the purpose of making repairs," and returned a verdict for the plaintiffs. The jury found that Mr. Harrison had sustained $175,000 in damages and was 25% at fault, while Katrina's damages were $100,000 and her fault was assessed at 90%. The trial court granted defendants' motion for a judgment notwithstanding the verdict stating that the plaintiffs had failed to make a submissible case to the jury. Specifically, the court determined that the plaintiffs had failed to present evidence that the defendants owed a duty of care to the plaintiffs.

## I.

■ Sustaining a motion for judgment notwithstanding the verdict is tantamount to directing a verdict at the close of all the evidence. *Commerce Bank of Lebanon, N.A. v. Berry*, 692 S.W.2d 830 (Mo.App. 1985). Such a motion is properly granted only if plaintiff failed to make a submissible case, that is, when all the evidence and reasonable inferences to be drawn therefrom are so strongly against plaintiff's case that there is no room for reasonable minds to differ. *McCulley v. State Farm Mut. Auto. Ins. Co.*, 668 S.W.2d 121 (Mo. App.1984); *Bizzle v. Enterprise Leasing*, 741 S.W.2d 84 (Mo.App.1987). The court must grant every reasonable inference the evidence provides to the appellants. *Commerce Bank of Lebanon, N.A.*, 692 S.W.2d at 831.

■ Plaintiffs' case was based on the long standing rule in Missouri that when a landlord retains partial control of the leased premises for the purpose of making repairs, then the landlord is obligated to make such repairs and to keep the premises in a reasonably safe condition for the use intended. *Tucker v. Taksel*, 345 S.W.2d 385 (Mo.App.1961); *Peterson v. Brune*, 273 S.W.2d 278 (Mo.1954). The *Tucker* case, which crystalized this rule in Missouri, was cited and approved by the Missouri Supreme Court in the case of *Lemm v. Gould*, 425 S.W.2d 190 (Mo.1968). In a clear and cogent analysis of the type of control necessary to impose liability on the landlord, the Supreme Court stated:

In order to be bound to keep the premises in a reasonably safe condition the landlord need not have reserved such a degree of control as to be entitled to admit or exclude others from the premises. It is sufficient that he retained a general supervision over the premises for a limited purpose such as the making of repairs or alterations, and the right to enter the premises and make repairs upon his own initiative and responsibility.

*Id.* at 195.

Initially, we were somewhat persuaded by the respondents' oral argument that the contract between the appellant and respondent limited maintenance responsibilities to appellants. However, that agreement was expanded by parol evidence at trial without objection. Thereafter, the contract between these parties was expanded with evidence to permit the trial court and jury to understand the intention of these parties. We find there is sufficient consideration for this modified contract to exist.

■ Taking the evidence in the light most favorable to the plaintiffs, the Roberts retained the right to control the premises for the purpose of making repairs. Not only were promises made at the outset of the lease concerning repairs and maintenance, but the landlords made periodic inspections of the property, entered the house for the purpose of making repairs and actually did make repairs to a portion of the porch in question. All of this oc-

curred before the accident. Furthermore, the landlords took their actions both on their own initiative and in response to requests by the tenants. However, there was no prerequisite that the tenants consent. As *Lemm* held:

In addition to the agreement to repair and replace, the landlords retained a key to the apartment not only for emergency uses but also to use to enter the apartment "to do any repairs that they might think necessary." This gave them the right to make repairs, on their own initiative and responsibility, without obtaining the consent of the tenants. This carried with it the implied right to enter for the purpose of inspecting the premises ·to determine what repairs were necessary. This reservation of right was not alone for the benefit of the tenants but enured to the benefit of the landlords because it entitled them, during the rental period, to take whatever action in the field of repairs and replacements deemed necessary to prevent waste and to protect their reversionary interests. Along with this right and benefit goes the correlative responsibility to keep the premises in reasonably safe condition for the use intended.

*Id.* at 195.

A review of the transcript wherein Mr. Roberts is being cross-examined reveals the degree of control Mr. Roberts intended to exercise:

Q. Certainly as a landlord you wanted to maintain a degree of control over what went on in the house, didn't you?

A. Well, I guess if you want to call a degree of control making sure that the property was maintained well and having the right to go by and make sure it was that way, I guess if that's what you want to call that.

Q. That's what you did, right?

A. And that's all I did, yes.

\*  \*  \*  \*  \*  \*

Q. Do you remember swearing in that deposition, "Question: And if you needed to get in the front door or back

doors, you wanted keys for both of them, right?

"Answer: Yes."

You made that statement?

A. I made that statement upon the assumption—I assumed I had a key, which I did not have.

Q. And the next question: "We have already discussed you did retain the right to make repairs if you felt them necessary, right?

"Answer: Yes."

A. The answer to that is if the property was not maintained, yes, I would, and I would give them their notice at the same time to move out.

Q. You are saying that now, here in Court, but when your deposition was taken, you said simply yes.

A. Because I was asked yes or no, I said yes.

Q. I didn't ask you to say yes or no, did I?

A. The answer was—

MR. POWELL: I think he has a right to explain his answer.

THE COURT: Any witness has a right to explain his answer but the question was, was that his answer in the deposition.

A. Yes, that was my answer in the deposition.

Q. (By Mr. Frickleton) Do you remember me ever anywhere in the deposition saying, "Mr. Roberts, you can only say yes or no. You can't explain your answer"?

A. No, I'm not saying I heard you say that, no.

Q. It wasn't this one question and answer, was it, Page 49, Line 14? I asked you, "Of course, as landlord, you retained the right to repair that if you felt it necessary, right?" And I was talking about the porch about a month before the accident, and your answer was, "Yes." Do you remember that?

A. I remember that. I remember—you want to read the question again to me.

Q. I'll read the whole series. We were talking about on Page 48 and 49 the repair you made of the lower stair and the handrail right before—about a month before this accident, and I asked you this question, Page 49, Line 9: "Certainly as a landlord you felt you had the right to go around and look at it if you wanted to, right? You weren't going to be in the house."

"Answer: Yes.

"Of course, as a landlord, you retained the right to repair that if you felt it was necessary?

"Answer: Yes."

Do you remember saying that, too?

A. Yes.

Q. And that's true, also, isn't it?

A. That's true because if it wasn't being taken care of, I do have the right—I own the property—to take care of that.

Q. And then on Page 50, "Question: For example, with wiring, that's something you just decided to do as landlord to retain the right to repair these wires?

"Answer: Yes."

A. Okay. The answer was yes, but again, I had the right. I asked if I could go in to look at the wiring. I was not doing any wiring until they moved out. I wanted to find out what it was going to cost to take care of it and so, yes, I felt I had that right to do that.

For the aforesaid reasons, we believe that defendants did in fact retain partial control of the house for the purpose of making repairs.

■ Next, we must determine whether the defendants had that actual or constructive knowledge of the dangerous condition. Not only does the evidence and the reasonable inferences therefrom give rise to a jury issue on the question of knowledge or notice, but Mr. Roberts admitted his pre-existing knowledge of the dangerous condition. He told Kim Harrison's father on the day after the accident that he knew the lumber used to build the porch was untreated, knew it needed painting, had previously promised to paint it and wished he had done so earlier. He also knew that the

guardrail was rickety, told Clyde Harrison that the porch should have been repaired earlier and was sorry that it had not been repaired earlier. Those admissions are binding on the defendants and easily give rise to a jury issue on the question of knowledge.

Furthermore, at a minimum, the evidence indicates constructive knowledge of the dangerous condition. The defendants were out at the house barely a month before the accident, inspected the lower steps and handrail and noticed they were shaky, loose and unstable. The landlords clearly recognized the danger of the loose lower step and handrail since they both independently asked the Harrisons to stay away from it until they could fix it. However, Mr. Roberts did not bother to even inspect the upper portion of the guardrail even though Mrs. Harrison specifically asked Mrs. Roberts to have her husband fix the upper portion of the guardrail which was shaky.

This fact situation is strikingly similar to that found in *Peterson v. Brune*, 273 S.W.2d 278, 283 (Mo.1954). In that case, the bannister of a porch was rotten and ultimately collapsed and caused injury to a tenant. The specific portion of the bannister that failed was hidden from view by another board. However, the landlord had previously repaired another part of the porch which was rotten but did not inspect the remainder. The Court held that even though the portion of the porch that failed causing the accident was not visible, the landlord was not relieved of the duty to use ordinary care to discover the "concealed defect" and to repair it.

 Just as in *Peterson*, the dangerous and defective condition of one part of the porch gave rise to a duty to inspect the rest of the porch, in this case the unstable loose step and lower handrail gave rise to the duty on the part of the Roberts to inspect the rest of the porch and handrail. In short, a reasonable juror could find that the defendants could have known of the loose upper guardrail, especially when coupled with the fact that Mrs. Harrison mentioned it one month prior to the fall.

The same analysis holds true with respect to the rotten porch floor. Mr. Roberts knew that the wood used on the porch floor was untreated and knew that it needed paint to preserve it from the elements. However, he rented the house with the porch floor in serious need of painting, knowing it was exposed to the elements and knowing it had the potential for rotting. Plaintiff made a submissible case, both as to defendants' knowledge of the unstable guardrails and constructive knowledge of the rotten porch floor. Even if defendants did not have actual knowledge of the rotten porch floor, they knew all the elements were present to produce wood rot and did nothing about it. This despite Mr. Roberts' repeated promise to paint the porch. Those facts are sufficient to give rise to the constructive knowledge necessary to support the verdict. *Tucker v. Taksel*, 345 S.W.2d at 388.

There was sufficient evidence that plaintiffs met their burden of submissibility. The JNOV is hereby reversed and the jury's verdict, together with interest is reinstated. For the aforesaid reasons, there is no need to discuss the second point raised by appellants.

All concur.